In The

# United States Court of Appeals

### For The Fourth Circuit

◆

No. 14-1208

PETR BOCEK, M.D., PH.D.,

*Plaintiff-Appellant,*

*vs.*

JGA ASSOCIATES, LLC, ET AL.,

*Defendant-Appellees.*

*Appeal from the United States District Court for the*
*Eastern District of Virginia*
*(Hon. Claude M. Hilton, Senior District Judge)*

## BRIEF FOR PLAINTIFF-APPELLANT
## PETR BOCEK, M.D., PH.D.

S. MICAH SALB
MARY E. KUNTZ, Ph.D.
Attorneys for Plaintiff-Appellant
Petr Bocek
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814
(301) 656-6905

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici.** The Parties to this action, in the court below and in this Court, are the Plaintiff, Petr Bocek, M.D., Ph.D., and the Defendants, JGA Associates, LLC, and Joseph Amato.

(B) **Rulings under Review.** Plaintiff appeals from the decision of the trial court, through Hon. Claude M. Hilton, Senior District Judge, finding for the Defendants.

(C) **Related Cases.** This case was previously heard by this Court in case number 12-1590. There are no related cases.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities. . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

**JURISDICTIONAL STATEMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE ISSUES PRESENTED**. . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**FACTS**. . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    The Parties' Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    Dr. Bocek Asked Amato for Advice
      Regarding the Purchase of ACC. . . . . . . . . . . . . . . . . . 5

C.    Dr. Bocek Told Amato Not To Share His Name with
      the Seller. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.    Amato Performed Due Diligence on Behalf of Dr. Bocek. . . . . . . . . . 8

E.    Amato Schemed to Gain a Secret Windfall Profit
      at Dr. Bocek's Expense. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

F.    Amato Terminated His Agreement with Dr. Bocek
      and Used the Information Gained from His
      Agency Relationship with Dr. Bocek to
      Buy ACC for Himself. . . . . . . . . . . . . . . . . . . . . . . . . 15

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**ARGUMENT**. . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.    The District Court Erred in Finding That There Was No Agency
            Relationship on the Grounds That the Parties'
            Written Agreement Does Not Make Reference
            to Work Related to the Purchase of ACC. . . . . . . . . . . . 24

B.    The Parties' Conduct Plainly Demonstrates the Existence
            of an Agency Relationship.. . . . . . . . . . . . . . . . . . . . . . . 26

    1.    The Law of Agency in Virginia. . . . . . . . . . . . . . . . . . . . 26

    2.    Amato Admitted That He Was Dr. Bocek's Agent. . . . . . . . . . 28

    3.    There Is Overwhelming Evidence Demonstrating That
            Amato was Dr. Bocek's Agent Because Dr. Bocek
            Asked Amato to Act for Him and at his Direction
            and Amato Manifested Consent to Do So.. . . . . . . . . . . 31

    4.    This Is a Paradigmatic Case of One Person Putting
            Special Confidence in Another Requiring the
            Other to Act for the Benefit of the First Party. . . . . . . . 33

    5.    Amato Offers Only the Flimsiest of Defenses
            to His Breach of His Fiduciary Duties. . . . . . . . . . . . . . 36

    6.    Because the Undisputed Facts Demonstrate That Amato
            Was Bocek's Agent and Owed a Fiduciary Duty to
            Bocek, and Because Amato Has No Defense to His
            Breach, Dr. Bocek Is Entitled to Judgment.. . . . . . . . . . 39

C.    The District Court Erred in Concluding
            That Dr. Bocek Did Not Prove Damages. . . . . . . . . . . . 40

D.    For the Appearance of Justice, this Case Should Be Reassigned.. . . . . 43

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**REQUEST FOR ORAL ARGUMENT**.. . . . . . . . . . . . . . . . . . . . . . . 46

iii

# TABLE OF AUTHORITIES

## Federal Cases

Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985). . . . . . . . . . 19

Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100 (2009). . . . . . . . . . . . . . . 1

Bocek v. JGA Associates, LLC, 537 Fed.Appx. 169 (4th Cir. 2013). . . . 3, 21

J.S.K. Realty Co. v. New Plan Realty Trust,
    9 Fed.Appx. 89 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Owen v. Comm'l Union Fire Ins. Co. of NY,
    211 F.2d 488 (4th Cir. 1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Roanoke Cement Co., L.L.C. v. Falk Corp.,
    413 F.3d 431 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Terry v. SunTrust Banks, Inc., 493 Fed.Appx. 345 (4th Cir. 2012). . . . . . . 27

U.S. v. Guglielmi, 929 F.2d 1001 (4th Cir.1991). . . . . . . . . . . . . . . . . . . . 44

U.S. v. Lentz, 383 F.3d 191 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . 45

U.S. v. N. Carolina, 180 F.3d 574 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . 45

Prototype Productions, Inc. v. Reset, Inc.,
    844 F.Supp.2d 691 (E.D.Va. 2012). . . . . . . . . . . . . . . . . . . . . . . . 28

Nortec Comm's, Inc. v. Lee–Placer,
    548 F.Supp.2d 226 (E.D.Va. 2008). . . . . . . . . . . . . . . . . . . . . . . . 38

Depuy Synthes Sales, Inc. v. Jones, 2014 WL 1165852 (E.D.Va.). . . . . . . 38

## State Cases

Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.,
    263 Va. 377 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Bloxom v. Rose, 151 Va. 590 (1928). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Chandler v. Kelley, 149 Va. 221 (1928). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cooper v. Cooper, 249 Va. 511 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Drake v. Livesay, 231 Va. 117 (1986). . . . . . . . . . . . . . . . . . . . . . . . 25, 28

H-B Ltd. P'ship v. Wimmer, 220 Va. 176 (1979). . . . . . . . . . . . . . 18, 27, 33

Horne v. Holley, 167 Va. 234 (1936). . . . . . . . . . . . . . . . . . . 22, 26, 41, 42

International Paper Co. v. Gilliam, 63 Va.Cir. 485,
    2003 WL 23573613. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Leonard v. Counts, 221 Va. 582 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Murphy v. Holiday Inns, Inc., 216 Va. 490 (1975). . . . . . . . 18, 22, 28, 31-33

Peace v. Conway, 246 Va. 278 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Raney v. Barnes Lumber Corp., 195 Va. 956 (1954). . . . . . . . . . . . . . . . . 27

Reistroffer v. Person, 247 Va. 45 (1994). . . . . . . . . . . . . . . . . . . . . . . 27, 28

Royal Indem. Co. v. Hook, 155 Va. 956 (1931) . . . . . . . . . . . . . . . . . . . 25, 28

State Farm Mut. Auto. Ins. Co. v. Weisman, 247 Va. 199 (1994) . . . . . . . . 27

Texas Co. v. Zeigler, 177 Va. 557 (1941) . . . . . . . . . . . . . . . . . . . . . . . . 28

Thaxton v. Commonwealth, 211 Va. 38 (1970) . . . . . . . . . . . . . . . . . . . . 25

Today Homes, Inc. v. Williams, 272 Va. 462 (2006) . . . . . . . . . . . . . . 38, 40

Whitfield v. Whittaker Mem'l Hosp., 210 Va. 176 (1969) . . . . . . . . . . . . . 28

## **Other Authorities**

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Restatement (Second) of Agency (1958) . . . . . . . . . . . . . . . . . . . . . 27, 38

A.L.I. Restatement Restitution section 194(2) . . . . . . . . . . . . . . . . . . . . . 42

**In The**
**United States Court of Appeals**
**For The Fourth Circuit**

---

No. 14-1208

---

PETR BOCEK, M.D.,PH.D.

*Plaintiff-Appellant,*

*vs.*

JGA ASSOCIATES, LLC, et al.,

*Defendant-Appellees.*

---

Appeal from the
United States District Court
for the Eastern District of Virginia
(Hon. Claude M. Hilton, Senior District Judge)

---

**BRIEF FOR PLAINTIFF-APPELLANT**
**PETR BOCEK, M.D., PH.D.**

---

## JURISDICTIONAL STATEMENT

Petr Bocek, M.D., Ph.D., filed this suit on May 19, 2011.  Jurisdiction in the district court was properly based on 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeded $75,000 and there was complete diversity of citizenship among the Parties.

Appellate jurisdiction of this Court is properly based on 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction of appeals from all final decisions of the district courts.  Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 106 (2009).

## STATEMENT OF THE ISSUES PRESENTED

There are four issues in this appeal arising out of the district court's grant of judgment in favor of the Defendants:

(1)      Whether the district court erred in granting judgment for the Defendants on Dr. Bocek's claim for Breach of Fiduciary Duty based solely on the language of the contract between the Parties.

(2)      Whether the district court erred in granting judgment for the Defendants on Dr. Bocek's claim for Breach of Fiduciary Duty without examining the Parties' conduct to determine whether an agency relationship was formed.

(3)    Whether the district court erred in granting judgment for the Defendants on Dr. Bocek's claim for Breach of Fiduciary Duty when the evidence demonstrated without reasonable dispute that the Defendants were Dr. Bocek's agents.

(4)    Whether the district court erred in concluding that Dr. Bocek had not proved that he was entitled to damages.

(5)    Whether this case should be reassigned to a different district judge in order to avoid the appearance of injustice arising from the appearance that the district judge has prejudged the case.

## STATEMENT OF THE CASE

Dr. Bocek filed suit against the Defendants, Joseph P. Amato and JGA Associates, LLC,[1] on May 19, 2011.  On July 22, 2011, Dr. Bocek filed a Verified Amended Complaint, presenting four counts: (1) Fraudulent Conveyance and Constructive Trust; (2) Breach of Fiduciary Duties; (3) Breach of Contract; and (4) Breach of Fiduciary Duties.

---

[1] Plaintiff also named Allergy Care Centers, Virginia, Inc., but dismissed it pursuant to Rule 41 on June 24, 2011.  A fourth defendant, A2 Medical Group, Inc., was later added but as a result of the this Court's decision when this case was previously before the Court, that Defendant is no longer in the case.

2

On October 21, 2011, the Defendants filed a <u>Motion for Summary Judgment</u>. The district court granted the motion on November 10, 2011, and issued its Order and memorandum opinion on April 5, 2012. Appeal was timely noticed on May 1, 2012.

This Court reversed the district court's dismissal of Mr. Bocek's claim for tortious Breach of Fiduciary Duties. <u>Bocek v. JGA Associates, LLC</u>, 537 Fed.Appx. 169 (4th Cir. 2013).

Following remand, a bench trial was had on December 9, 2013. The district court granted judgment for the Defendants, disposing of all parties' claims. The district court's decision was plain error, giving rise to the instant appeal.


**FACTS**

**A.     The Parties' Agreement.**

On November 10, 2011, Petr Bocek entered into a contract with JGA Associates, Inc. (hereinafter "JGA") and its owner, Joseph Amato,[2] for business development advice and assistance securing business financing. JA00221; JA00075-76. In the Letter of Agreement between the Parties (hereinafter the "Agreement"), Amato agreed to provide advice and assistance to Dr. Bocek in

---

[2] JGA and Amato are collectively referred to herein as "Amato".

developing a business plan, as well as assistance in securing the financing required to begin a medical practice.  JA00081.

Dr. Bocek and Amato agreed that Dr. Bocek would pay for Amato's services through two forms of compensation.  JA00076-77 ("JGA agreed to work on a project for Dr. Bocek, and there was going to be compensation involved in that -- in those services"); *see* JA00222 (contract's payment terms).  The first was a "development fee" of $3,800.  Id.  The second was a "completion fee," consisting of two percent of any amount of financing which Amato helped Dr. Bocek secure.  Id.

Accordingly, Dr. Bocek remitted $3,800 to Amato.  JA00224; JA00079.  Amato accepted Dr. Bocek's check and used that money to fund the operations of JGA Associates, LLC.  Id.  Amato concedes that a contract was formed.  JA00075-76.  He also concedes (albeit unwillingly) that the Agreement created an agency relationship. JA00112.

The scope of work provided for in the Agreement related primarily to assisting Dr. Bocek with the formation and funding of a new medical practice, because that is what Dr. Bocek discussed with Amato.  JA00080; JA00221 (the Agreement); *see* JA00227 (covering email).  The scope of work also extended to "such other services as may be agreed upon by Client and Consultant from time to time."  JA00221; JA00225; *see* JA00291 (JGA invoice showing development fee of $3,800 paid under

4

contract as well as additional billing for work done related to the acquisition of ACC));

JA00293 (JGA time sheet showing same); JA00081.

## B.    Dr. Bocek Asked Amato for Advice Regarding the Purchase of ACC.

Five days after signing the Agreement, Dr. Bocek informed Amato about a business opportunity he knew of that was relevant to the work that Amato had undertaken to provide for him:

> While we talked last time I was encouraged by your optimism about your ability to secure funding for our project. In view of that, I wanted to know what do you think would be more attractive for a potential lender - new practice versus acquisition of a current one. The Allergy Care Centers where I worked is now for sale. As I mentioned, the owner died more than two years ago and the practice is owned by his estate. The estate is burdened by unpaid taxes over several past years ($2.9 million) but the practice is profitable and generates significant income. It would have to be trimmed (likely number of offices and staff) and made more efficient but the advantage is that I am fully credentialed under it and I could get to work immediately if I acquired it. Please let me know what you think.

JA00230; JA00090; *see* JA00235 (Bocek's follow-up email).[3]

---

[3] The acquisition of ACC was attractive because it had apparently not been very well run during the prior owner's lifetime and it suffered from lack of strong leadership when the administrator of the estate of the prior owner ran the practice from afar. JA00235. In addition, the estate had engaged a business valuation firm to value the practice, likely focusing especially on factors that would reduce its valuation for estate tax purposes since the estate labored under a burdensome estate tax bill. JA00110-15. Thus, the price was lower than it might otherwise have been.

Amato replied, telling Dr. Bocek that "acquisition of an existing operating practice is always more attractive if the price and the historic financial performance make sense". Amato told Dr. Bocek that he anticipated that the project would be "far more complicated than we originally anticipated" and suggested that Dr. Bocek should "negotiate an asset sale" with the Estate. JA00225.

Amato admits that he did not know of opportunity to acquire ACC before Dr. Bocek informed him about it. JA00091-92.

On December 1, Dr. Bocek gave Amato the name and web address of the lawyer who was administering the estate, Peter Klenk. JA00231; JA00092. Amato immediately reached out to Mr. Klenk. JA00232, 234. Amato admits that he never would have contacted Mr. Klenk but for Dr. Bocek's inquiry to him about ACC. JA00094. Amato understood that the reason Dr. Bocek had asked him about the attractiveness of acquiring an existing business was that Dr. Bocek was exploring the possibility of acquiring Allergy Care Centers. JA00095.

Amato also knew that Dr. Bocek made his inquiry about ACC for the purpose of obtaining JGA's professional advice regarding the possibility of acquiring the Allergy Care Centers. JA00107-08. Amato was regularly engaged in the business of providing business formation and acquisition advice. JA00086-87; *see also* JA00227 (Amato email discussing his experience). Over the course of 22 years, Amato had done

6

about 2,000 transactions helping people create or purchase businesses. JA00086-87.

The advice that Amato gave to Dr. Bocek was based on that experience and

knowledge. JA00087-88. Amato knew that Dr. Bocek would be relying on his

experience, knowledge, and judgment. JA00087; *see* JA00227 (inviting Dr. Bocek to

rely on JGA's experience). As Dr. Bocek had explained to Amato, "Your opinion and

analysis are critical to me in this decision." JA00236; *see* JA00088 (Amato

acknowledging that Dr. Bocek explicitly told Amato that he relied heavily on Amato's

opinion and analysis).

**C.    Dr. Bocek Told Amato Not To Share His Name with the Seller.**

From the beginning of this venture, Dr. Bocek directed Amato many times not

to mention his name to the Estate as the purchaser, explaining that he had a dispute

with the practice related to the termination of his employment. JA00095; *see*, *e.g.*,

JA00231, JA00235. Amato admits that this was a truthful statement: Dr. Bocek was,

in fact, engaged in negotiations to resolve a dispute with ACC regarding the termination

of his employment. JA00095-96. Dr. Bocek informed Amato that if the practice

managers were aware of his involvement in the acquisition, it might sour the deal

because they might not want to sell to him. *See* JA00317.

7

**D.    Amato Performed Due Diligence on Behalf of Dr. Bocek.**

Amato thereafter engaged in those activities necessary to purchase ACC's assets, such as, for example, contacting the trustee responsible for the sale of ACC and obtaining information about the assets of the medical practice.  *See*, *e.g.*, JA00232, JA00234, JA00237-48.  By Amato's own admission, he engaged in the due diligence process related to the ACC acquisition at Dr. Bocek's instructions.    JA00234, JA00235, JA00236; *see also* JA00087.  Indeed, Amato admitted that he was doing due diligence at Dr. Bocek's request.  JA00104 (but with the qualifier that that was the case "initially").

Amato sought direction from Dr. Bocek during due diligence, and Dr. Bocek responded with instructions, requests, and suggestions for analysis of ACC's financials, with requests for information for the due diligence, and the like.  *See*, *e.g.*, JA00154-67, JA00229-48, JA00267, JA00272, *see* JA00292 (Dr. Bocek discussed his plans for management changes at ACC).

During the course of due diligence, Amato regularly reported to Dr. Bocek about his discussions with the administrator of the estate that owned the practice.  Id.  For example, he promptly sent an email to Dr. Bocek the very same morning that he had reached out to Mr. Klenk.  Id.; JA00101.  He informed Dr. Bocek that he was going to put together a checklist of information that they would need from ACC to review the

project for acquisition, and after he created the checklist he sent a copy of it to Dr. Bocek. JA00234; JA00101. As Amato said, "We kept Dr. Bocek informed." JA00102.

Amato relied on Dr. Bocek's knowledge of ACC to guide his investigation. JA00236; JA00237; JA00265; JA00300. For example, he asked Dr. Bocek to edit, review, and add to his draft due diligence questions, which Dr. Bocek provided. JA00234; JA00235 (Bocek's response); JA00237; JA00272.

Amato did not pay Dr. Bocek for his assistance in the due diligence process. JA00152. To the contrary, Amato billed Dr. Bocek for the time that he spent doing the work necessary for the acquisition of ACC. JA00291 (invoice); JA00293 (time records); JA00077; JA00079 (answering "yes" when asked, "the time that you spent developing that work product was time that was paid for by Dr. Bocek on the hourly rate scale, right?").

In fact, Amato's trial testimony in this regard is significant. He testified that he billed Dr. Bocek more than the amount stated in the contract because at a meeting on January 22, 2012,

> We discussed that because the complete change in scope of project and that the project had morphed into something completely outside of a medical practice, setting up a medical practice, that we wanted him to contribute. We had amassed probably a bill close to 12- or $13,000. And we asked if Dr. Bocek would be willing to contribute to, you know, some

9

of the expenses that we had since we were still working and moving forward on the project.

JA00077; *see also* JA00152 (Amato testifying that he deserved ownership in the company because of his "sweat equity" — even though Dr. Bocek paid him for that sweat).

### E.    Amato Schemed to Gain a Secret Windfall Profit at Dr. Bocek's Expense.

After Dr. Bocek asked Amato for help buying ACC, Amato began to talk with investors (including Ron Cooper and Brian August) about financing the acquisition. *See*, *e.g.*, JA00249; JA00263; JA00084-85.  At some time during the month of December, though, he refocused his energy from assisting Dr. Bocek to advancing his own interests.  While the record cannot tell us when Amato first came up with the idea of double-dealing Dr. Bocek, it was clear that he quickly became attracted to the profit potential.

On the morning of December 22, 2010, Mr. Cooper sent an email to Amato proposing an arrangement whereby Amato and Cooper would purchase ACC for $1 million and then immediately sell it to Dr. Bocek for $2 million.  JA00263.  Amato loved the idea.  He wrote back to Cooper immediately, sharing some calculations that illustrated the great profit potential of such a deal.  Id.

10

Amato's calculations showed that if he and Cooper borrowed $1 million to purchase ACC and then immediately sold the business to Dr. Bocek, taking a note payable from Dr. Bocek for his $2 million purchase of the company from them, they would net a profit of $13,000 every month on the loan payments.  Id.  In addition, if Dr. Bocek paid off the balance remaining on the note after two years, his outstanding debt would then be about $1.69 million, which, after Amato and Cooper repaid their remaining loan debt, would leave about $1 million in profits (as well as the $340,000 in monthly profits gained over the two years from Dr. Bocek's loan payments).  Id.

That December 22 correspondence was not, however, the beginning of Amato's double-dealing.   Two days earlier, Amato had sent a Letter of Intent to the administrator of the estate, Peter Klenk, proposing to purchase ACC for $1 million. JA00259; JA00125.  On the same day, he sent an email informing Mr. August that he had submitted the Letter of Intent (JA00126; *see also* JGA401-412) but he did not advise Dr. Bocek that he had made a bid until three days later.  JA00126; *see* JA00265. Even then, he did not tell Dr. Bocek the price that he had offered.  JA00265 (email to Dr. Bocek does not disclose offer price).

During the course of negotiations for the purchase of ACC, Amato prepared multiple revisions of the Letter of Intent.  JA00127 (Amato admitting to half a dozen or so versions); *see* JA00259 (December 20 LOI); JA00287 (January 19 LOI);

11

JA00296 (February 1 LOI); JA00301 (February 8 LOI).  <u>Amato admits that he never</u>

<u>provided a copy of any of those Letters of Intent to Dr. Bocek</u>.  JA00127.

On several occasions, Dr. Bocek told Amato that he did not understand Amato's

plan for the purchase and asked Amato to provide copies of all documents to his

attorneys.  *See*, *e.g.*, JGA317 (December 23); JA00267 (December 27); JA00305;

JA000292, JA000181 (Bocek) (February 2); JA000182 (post-February 17).

Amato promised numerous times to comply.  For example:

- ❖ *See* JA00295 (Amato promising, "Our attorney will be ready to speak to your attorneys by next week");

- ❖ See  JA00300  (Amato  promising, "Once the documents are completed our attorney will send the information to your attorney, at your direction");

- ❖ See JA00304 (Amato promising, "we will provide all the documents to you once they are completed by our attorney").

Nevertheless, as Amato admitted at trial, he never actually provided the requested

documents.  JA00127 (claiming, obviously falsely, that Dr. Bocek "never requested a

copy").

The purchase price proposed in each of Amato's Letters of Intent was $1 million.

<u>Id.</u>; *see* JA00172.  But Amato provided conflicting information regarding the expected

purchase price of ACC to Dr. Bocek:

- ❖ On December 23, Amato informed Dr. Bocek that he had "placed a closed bid" for ACC "around $2M" and that he believed that they could negotiate it down

12

once the diligence documents were obtained to $1.8 to 1.9 million. JA00168; JA00172; JA00173; *see* JA00263.

❖ On January 31, Amato stated to Dr. Bocek that "the transfer price will be at or about $1.2 mm plus any fees or direct costs associated with closing the transaction; and including our costs/fees/profit for negotiating the transaction and being bought out of the 'partnership'." JA00295; JA00168. That was a false statement because the Letters of Intent (JA00259; JA00287; JA00296; JA00301) show that the transfer cost should be calculated on $1 million purchase price (plus closing costs), not $1.2 million (plus closing costs) as Amato had stated.

❖ In yet another email, Amato stated that the total cost to Dr. Bocek would be about $1.275 million. JA00300; JA00189-90.

Amato also failed to share information with Dr. Bocek about the negotiations. For example, on December 23, Dr. Bocek asked Amato to send him a copy of the offer if or when there was anything in writing. JA00172. Amato did not inform Dr. Bocek that he had actually transmitted a letter of intent several days earlier. Id.

Similarly, Amato never informed Dr. Bocek that he planned to charge Dr. Bocek more than Amato would be paying to acquire ACC. JA00173-74; JA00267.

In fact, in numerous emails to Dr. Bocek, Amato provided misleading responses to Dr. Bocek's inquiries about the deal, in an apparent effort to keep Dr. Bocek from becoming aware that Amato secretly planned to gain a large profit on the deal at Dr. Bocek's expense. For example:

❖ Amato stated that "everyone had the same goal of Dr. Bocek being the owner of ACC from the day of purchase." This statement was calculated to cause

Dr. Bocek to believe that he would be the owner of the company according to some binding arrangement; Amato did not state that there was no guarantee that Dr. Bocek would become the owner of ACC after it was purchased by Amato. JA00269.

❖ Further, Amato certainly did not state that while everyone might have wanted Dr. Bocek to be the owner of ACC, Amato wanted that because it would gain him a very nice profit at Dr. Bocek's expense. JA00269.

❖ In addition, Amato side-stepped Dr. Bocek's statement that there needed to be some mechanism securing his ownership of ACC without disclosing his identity to ACC, instead responding by focusing on a separate concern that the estate might object to Dr. Bocek becoming the owner of ACC after JGA purchases it. JA00269.

❖ Amato further acted to sidestep Dr. Bocek's concerns by accusing Dr. Bocek's lawyer of "over-thinking" the process. JA00269.

❖ Amato informed Dr. Bocek that he would supply some or all of the down payment, would secure the main lender for the acquisition of ACC, and would find the best funding opportunity, "once we know which direction is best for you." JA00269. This statement falsely communicated that Amato would be focused on Dr. Bocek's interests in devising a funding arrangement.

❖ Amato stated to Dr. Bocek that there were "four lenders . . . vying for funding of this project," but there is absolutely no evidence in the record to support the claims that there were four lenders or that Amato had created a dynamic whereby the lenders would compete to provide funding. *See* JA00300.

❖ On January 31, 2011, Dr. Bocek sent Amato an email asking whether he had received the Letters of Intent yet and whether he knew yet the asking price. JA00214-15; JA000640-41. Amato responded later that morning, providing Dr. Bocek with an updated list of ACC locations, but not providing him with a copy of the Letter of Intent that he had just sent to the estate. *See* JA00295.

**F.    Amato Terminated His Agreement with Dr. Bocek and Used the Information Gained from His Agency Relationship with Dr. Bocek to Buy ACC for Himself.**

On February 17, 2011, Amato gave notice to Dr. Bocek that he was terminating the Agreement.  JA00111; JA00317.  He advised Dr. Bocek, "we cannot assist you [any more] with developing a start-up medical practice or acquire an existing practice".  JA00317.  Pursuant to the terms of the Agreement, the termination was effective ten days later (i.e., on February 27, 2011).[4]  JA00112; JA00221.

In a pair of letters from Dr. Bocek's attorney, sent on February 22 and March 2, 2011, Dr. Bocek's attorney advised Amato that his fiduciary duties to Dr. Bocek remained in force even after the termination of the Agreement, and specifically warned Amato that he must not profit from the business opportunity that he learned about from his agency to Dr. Bocek.  JA00628; JA00632.  Dr. Bocek also demanded, *inter alia*, (1) that Amato advise him immediately of the status of his discussions regarding the purchase of ACC; (2) that Amato provide Dr. Bocek with all documents and correspondence regarding the purchase of ACC; and (3) that Amato explain what

---

[4] Amato asserted that he terminated the Agreement because of bad acts which Dr. Bocek is alleged to have done, which he claims to believe would be harmful to JGA's opportunity to purchase ACC.  JA00139; JA00317 ("We made the decision that we cannot assist you with developing a start-up medical practice or acquire an existing practice.")  However, Amato was never able to explain at trial how Dr. Bocek's alleged bad acts would have negatively affected the deal.

15

negative repercussions could arise as a result of proceeding in the process of purchasing ACC for Dr. Bocek's benefit. JA00628; JA00632. Amato admits that he did not comply with those requests. JA000147.

When Dr. Bocek's lawyers wrote to Amato, Amato could have canceled the prospective purchase of ACC's assets, since the Letter of Intent was non-binding. JA000138; *see* JA000301. Amato could have ceased pursuing the opportunity to purchase ACC at any time before he and his co-purchaser, Brian August, executed the asset purchase agreement on May 13, 2011. JA000138.

After terminating the Agreement, Amato knew that Dr. Bocek contended that the right to acquire ACC was a business opportunity that belonged to him. *See* JA000138; JA000628; JA000632. Nevertheless, on March 1, 2011, two business days after the effective termination date of the Agreement, Amato and August signed a Shareholders Agreement to form A2 Medical Group, Inc. JA000321; JA000072; JA000139-40. The next day, they registered a corporation called A2 Medical Group, Inc., with the Commonwealth of Virginia. JA000140; JA000330. Amato and August each held 50% of the company. JA000321. They formed A2 Medical Group for the purpose of receiving ACC's assets. JA000140.

Brian August was aware of Dr. Bocek's claim of ownership of the opportunity to purchase ACC. *See* JA000326 § 8.4. In fact, August required Amato to indemnify

16

him and A2 Medical Group if either suffered any liability "relating to the . . . previous discussions with Dr. Bocek regarding the business to be purchased by the Corporation." JA00073-74; JA00326 § 8.4.

The Estate that owned ACC petitioned the Orphan's Court for leave to sell ACC to JGA Associates, LLC, or its assigns. *See* JA00307-316. After the Court granted the petition, Defendant JGA Associates assigned its right to acquire ACC's assets to A2 Medical Group. JA000140.

Even at this point, Amato was careful to avoid creating a paper trail which would indict him for his self-dealing. For example, he warned that there should be "[n]othing in writing that would tie or imply a connection between JGA Associates to A2 Medical Group." JA00357; JA00358.

On or about May 13, 2011, A2 Medical Group entered into an Asset Purchase Agreement with ACC. JA00331. They completed the purchase on June 22, 2011. JA00140; Answer of A2 Medical Group [Dkt. 78], ¶ 171.

Dr. Bocek received no benefit from the sale of ACC to A2 Medical Group. JA00147.

Amato and Mr. August agreed that the value of ACC was $3 million at the time of acquisition. JA00256; JA00258; *see also* JA00323 (agreeing that the company's value was 3.5 times EBITDA; with net operating income of approximately $900,000

17

(*see* JA00276), the company valuation per the Amato-August agreement would be $3.15 million); JA153-54.

## SUMMARY OF THE ARGUMENT

Joseph P. Amato and the company he runs, JGA Associates, LLC, were agents of Dr. Petr Bocek. Dr. Bocek asked Amato to assist him in acquiring Allergy Care Center and relied on Amato to use his experience, judgment, and knowledge for Dr. Bock's benefit. Dr. Bocek was unaware that soon after he had engaged Amato, Amato began scheming to make this transaction a financial windfall for himself at Dr. Bock's great expense.

This case represents a classic case of double-dealing in violation of the law governing fiduciaries. Because Amato was plainly Dr. Bocek's agent under the rules stated in  Murphy v. Holiday Inns, Inc., 216 Va. 490 (1975) and H-B Ltd. P'ship v. Wimmer, 220 Va. 176 (1979), he owed a fiduciary duty to Dr. Bocek. He breached that duty by secretly using the access and information he got as Dr. Bocek's agent to serve himself.

The district court granted judgment to the Defendants after conducting a bench trial. That grant of judgment was clear error because it disregarded the law of

fiduciaries and disregarded the guidance that this Court provided when this case was previously on appeal.

The district court also erred in finding that Dr. Bocek had not presented evidence of damages.  Dr. Bocek presented cognizable and persuasive proof of damages and the Defendants offered no rejoinder.

The facts presented at trial are susceptible of but one conclusion: That the Defendants breached their fiduciary duties to Dr. Bocek, that there is no defense to that breach, and that Dr. Bocek is entitled to judgment.

Finally, because the district judge's decision contradicts and disregards this Court's decision in the prior appeal, this case should be reassigned to a new district judge so as to avoid the appearance of injustice that arises when there is the appearance of a judge prejudging a case.


## STANDARD OF REVIEW

As to this Court's review of the district court's findings of fact, Rule 52(a)(6) imposes the "clearly erroneous" standard of review.  J.S.K. Realty Co. v. New Plan Realty Trust, 9 Fed.Appx. 89, 94 (4th Cir. 2001); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).  However, this rule does not apply when the district court has committed an error of law which has manifestly influenced or controlled the

19

court's findings of fact, such as a mistake as to the applicable burden of proof.  Owen

v. Commercial Union Fire Ins. Co. of N.Y., 211 F.2d 488 (4th Cir. 1954).

Conclusions of law, however, are always examined de novo.  Roanoke Cement

Co., L.L.C. v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005).


### ARGUMENT

In November 2010, Petr Bocek entered into a written contract with Defendants

Joseph P. Amato and JGA Associates, LLC (hereinafter "JGA") to obtain Amato's

assistance in the creation of an allergy care medical practice.  Almost immediately after

forming the contract, Dr. Bocek realized that acquisition of an existing practice, the

Allergy Care Center (hereinafter "ACC"), might make more sense.  Dr. Bocek had

formerly worked for ACC.  He knew that its owner had died and the practice was

probably for sale.  Because he had been the Medical Director, he had substantial

knowledge about ACC and he knew that acquiring ACC could be very lucrative

because there were many management improvements that could yield great dividends.

Therefore, Dr. Bocek asked Amato about the desirability of acquiring ACC

rather than creating a new practice.  Amato told Dr. Bocek that acquiring an existing

practice is always more attractive than forming a new practice.  Based on that advice,

Dr. Bocek asked Amato to help him purchase ACC.

20

Dr. Bocek realized, however, that if ACC's general manager knew that he were the potential purchaser, it might sour the deal because of "bad blood" between her and himself. Therefore, Dr. Bocek told Amato not to disclose his identity to ACC.

Amato followed Dr. Bocek's instructions: He worked hard to acquire ACC and he did not disclose to ACC that Dr. Bocek was to be the purchase. But he used the access that he had as Dr. Bocek's straw purchaser to take the business opportunity for his own benefit. Hoping to secure a windfall profit of hundred of thousands of dollars or more in a very brief time, Amato hid from Dr. Bocek the fact that he was plotting to buy the business for himself at one price and then resell it to Dr. Bocek at an inflated price.

The instant litigation arose from these events.

Following discovery, the district court granted summary judgment in favor of Amato. Dr. Bocek appealed that decision, and this Court reversed the grant of summary judgment on Dr. Bocek's claim for tortious breach of fiduciary duties. Bocek v. JGA Associates, LLC, 537 Fed.Appx. 169 (4th Cir. 2013). This Court found that, "there is little question that, under the general law of agency, the conduct Bocek alleges is a clear breach of fiduciary duty." Id.

21

This Court's opinion in the first appeal is especially relevant in the instant appeal because the Court found that the facts alleged in the Complaint constitute a breach of fiduciary duties:

> Bocek alleged that he brought the ACC business opportunity to JGA during the existence of the agency relation, and that JGA was acting on behalf of Bocek when it began negotiating with the Estate and conducting due diligence. Bocek alleged that the defendants breached their fiduciary duties by, *inter alia*, using information obtained on Bocek's behalf to pursue the acquisition of ACC for themselves, refusing to return the due diligence materials to him, and, of course, buying ACC for their own benefit rather than for Bocek's benefit.

> **The evidence in the record is more than sufficient, for summary-judgment purposes, to support the factual allegations outlined above, and there is little question that, under the general law of agency, the conduct Bocek alleges is a clear breach of fiduciary duty.** Agents are fiduciaries and owe their principals a strict duty of loyalty. *See Restatement (Third) of Agency* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). An agent breaches his fiduciary duties by purchasing for himself property that he was to purchase for his principal. *See Rowland v. Kable*, 174 Va. 343, 6 S.E.2d 633, 642 (1940) ("One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself.... The rule applies alike to agents, partners, guardians, executors and administrators...."); *Horne v. Holley*, 167 Va. 234, 188 S.E. 169, 172 (1936) ("It is well settled that where one person sustains a fiduciary relation to another he cannot acquire an interest in the subject matter of the relationship adverse to such other party."). An agent likewise breaches his fiduciary duty by using confidential information belonging to the principal for the agent's own benefit. *See Restatement (Third) of Agency* § 8.05(2) ("An agent has a duty ... not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.").

22

*Bocek*, 537 Fed.App'x at 175-76 (emph. added).  Trial without a jury was had on December 9, 2013.  Dr. Bocek proved at trial the facts which were mere allegations when this Court reviewed this decision before.  Those allegations were the basis of this Court's decision that summary judgment was not warranted; as proven facts, those contentions clearly demonstrate that Dr. Bocek was entitled to judgment.  There should have been no question as to the outcome of the case.

However, following the bench trial, the district court again issued judgment for the Defendants.  The district court found that there was no agency relationship between Dr. Bocek and Amato because the written contract between them did not establish such a relationship as it relates to the purchase of Allergy Care Centers.  JA00654.

The district court's decision was clear error.  It disregarded this Court's opinion as well as the law governing agency and fiduciary relationships.  As such, the district court's decision must be reversed, judgment should be entered for Dr. Bocek, and the case remanded with instructions that it be reassigned to a new district judge for determination of the appropriate remedy.

**A.    The District Court Erred in Finding That There Was No Agency Relationship on the Grounds That the Parties' Written Agreement Does Not Make Reference to Work Related to the Purchase of ACC.**

The district court held that the Agreement did not create an agency relationship because it does not demonstrate that Amato[5] agreed to act as Dr. Bocek's agent as to the purchase of ACC.  JA00655.  The district court wrote:

> In seeking to demonstrate an agency relationship, Bocek seemingly attempts to implicate two different "agreements":  (1) the written Consulting Agreement; and (2) an oral straw purchase agreement for the purchase of Allergy Care Centers.

JA00654.  In this finding, the district erred both as a matter of fact and as a matter of law.

As a matter of law, the court erred because an agency relationship is not determined by looking simply at the terms of the contract between the Parties but instead by looking at the parties' entire course of conduct.  And as a matter of fact, the court erred in concluding that Dr. Bocek relied on these two agreements to show the existence of an agency relationship.   As discussed in Part 2, *infra*, Dr. Bocek demonstrated that the agency relationship was created through the Parties' entire course of conduct, as is consistent with Virginia law.

---

[5] As noted above, for the sake of simplicity, the Defendants are referred to throughout this brief in the singular as "Amato".

The law of agency in Virginia has always held that "[a]gency may be inferred from the conduct of the parties and from the surrounding facts and circumstances." Drake v. Livesay, 231 Va. 117, 121 (1986) (citing Royal Indem. Co. v. Hook, 155 Va. 956, 970 (1931)); Bloxom v. Rose, 151 Va. 590, 598–99 (1928) (the circumstances, the parties' conduct, and the parties' relations with one-another determine whether an agency relationship exists). "[W]hat evidence shall be sufficient to establish agency in any given case . . . must be determined in view of the facts in each particular case." Id. at 595 (quotation marks and citation omitted).

Importantly, "the relationship of the parties does not depend upon what the parties themselves call it, but rather in law what it actually is." Chandler v. Kelley, 149 Va. 221, 231 (1928); Thaxton v. Commonwealth, 211 Va. 38, 43 (1970).

Thus, the district court's finding that there was no agency relationship simply because the Agreement did not make reference to services related to the purchase of ACC and because the acquisition of ACC was not discussed between the Parties until five days after the Agreement was signed is error. It disregards the long-standing law in Virginia providing that proving the existence of an agency relationship is based on the parties' relationships and conduct, not simply the words recited by the Parties.

The district court also found that the Dr. Bocek and Amato had agreed only that Amato would do a "feasibility analysis" as to Dr. Bocek's ability to create a medical

practice, *not* that Amato would serve as Dr. Bocek's agent. JA00657-58. For the same reason, that finding also was error: Even if the Parties had agreed that Amato would only do a feasibility study (a conclusion not borne out by the evidence[6]), that would not answer whether Amato became Dr. Bocek's agent through his conduct.

## B.     The Parties' Conduct Plainly Demonstrates the Existence of an Agency Relationship.

Based on its finding that the written Agreement between the Parties did not create an agency relationship, the district court granted judgment to the Defendants, never analyzing whether the Parties' <u>conduct</u> demonstrated the existence of an agency relationship, as is the proper standard for determining the existence of an agency relationship under Virginia law. In that regard, there can be but one conclusion: Amato was plainly Dr. Bocek's agent.

### 1.     The Law of Agency in Virginia.

Agency is defined in Virginia law as:

---

[6] For example, when Amato terminated his agreement with Dr. Bocek, he explicitly stated that he would no longer assist Dr. Bocek <u>in purchasing an existing practice</u>. JA00317.

26

a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act.

Reistroffer v. Person, 247 Va. 45, 48 (1994); *see also* State Farm Mut. Auto. Ins. Co. v. Weisman, 247 Va. 199, 203 (1994); Murphy v. Holiday Inns, Inc., 216 Va. 490, 492 (1975) (*quoting* Restatement (Second) of Agency, § 1 (1958)); Raney v. Barnes Lumber Corp., 195 Va. 956, 966 (1954); *see* Terry v. SunTrust Banks, Inc., 493 Fed.App'x 345, 355 (4th Cir. 2012).

Virginia law holds that a "fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." H-B Ltd. P'ship v. Wimmer, 220 Va. 176, 179 (1979) (*citing* Horne v. Holley, 167 Va. 234, 239-240 (1936)). Thus, for example, in *H-B Ltd. Partnership*, the court found that a real estate broker, charged with negotiating the purchase of property, breached his fiduciary duty where he purchased property for himself. 220 Va. at 179.

An agency relationship also arises under Virginia law when one person manifests consent to another that the other shall act on his behalf and subject to his control. *Reistroffer*, 247 Va. at 48; *see also Terry*, 493 Fed.App'x at 355.

In determining whether a person is the agent of another, it is necessary that he not only be subject to the latter's . . . right of control, with regard

27

to the work to be done and the manner of performing it, but the work has to be done on the business of the principal or for his benefit.

Prototype Productions, Inc. v. Reset, Inc., 844 F.Supp.2d 691, (E.D.Va. 2012) (quoting Whitfield v. Whittaker Mem'l Hosp., 210 Va. 176, 181 (1969)).

The power of control is an important factor in determining whether an agency relationship exists. *Reistroffer*, 247 Va. at 48 (citing Texas Co. v. Zeigler, 177 Va. 557, 564 (1941)). If the plaintiff has the "right to control the methods or details of doing the work," then an agency relationship is created. *Murphy*, 216 Va. at 495.

However, though the power of control is an important factor, it is not conclusive. The Virginia Supreme Court has said that "determining whether an agency relationship exists . . . may be inferred from the conduct of the parties and from the surrounding facts and circumstances" and rejects a more rigid insistence that "power to control" be demonstrated. Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P., 263 Va. 377, 384 (2002) (*citing inter alia* Drake v. Livesay, 231 Va. 117, 121 (1986); Royal Indem. Co. v. Hook, 155 Va. 956, 970 (1931)).

**2.     Amato Admitted That He Was Dr. Bocek's Agent.**

This is not a case in which there can be made any reasonable argument that Amato was not Dr. Bocek's agent. After all, when Amato terminated his Agreement

28

with Dr. Bocek, he acknowledged that he had been working to advance Dr. Bocek's goals. He stated, "we cannot assist you [any more] with developing a start-up medical practice or acquire an existing practice". JA000317.

And at trial he plainly admitted that he was working at Dr. Bocek's request and on behalf of Dr. Bocek, thereby admitting that he was Dr. Bocek's agent:

Q.   You were doing the due diligence work regarding ACC at Dr. Bocek's request, right?

A.   It depends on what time frame you're talking about. Initially, yes; eventually, no.

Q.   Dr. Bocek had said to you this is an opportunity and you followed through, right?

A.   Initially, yes.

Q.   You did it because Dr. Bocek had asked you to look at the opportunity or possibility of an acquisition of Allergy Care Centers, right?

A.   At that point in time, we were looking to the feasibility of the possible purchase of ACC, because, again, it was only a feasibility study at that time, and there was also an active bidding process so we were looking at that.

And at the same time, we still had not been told to stop the process of looking at some of the additional sites, some of the things that he was looking at as far as starting up his own medical practice. So we were still following two tracks about the same time.

Q.   You were following two tracks on behalf of Mr. Bocek, right?

29

A.    We had a letter of agreement that still was in force that said we were supposed to help him with the medical practice. He asked us to look at the possibility and the feasibility of purchasing ACC.

We were also looking at the possibility and feasibility of him being an owner of either a startup medical practice or, you know, the possibility of owning ACC.[7]

Q.    Right. So you're doing those two tracks at the same time on behalf of Dr. Bocek; isn't that correct?

A.    At that point in time, yes.[8] JA000104-105.

JA000104-105.

Thus, Amato admitted that he provided services to Dr. Bocek and at Dr. Bocek's behest, making him Dr. Bocek's agent. The district court's decision is error because it disregards this plain demonstration and admission of agency.

---

[7] This assertion is entirely unsupported by any evidence except for Amato's bald assertion. Dr. Bocek testified to the contrary: "There certainly was no work, to my knowledge, as far as development of new medical practice. I have not seen a single piece of paper to that effect." JA00180; *see also* JA000291 (invoice) and JA000293-94 (time sheets).

[8] The theory of Amato's defense appears to consist of acknowledging that he was Dr. Bocek's agent "initially," but that he ceased being Dr. Bocek's agent at some point in time, unburdening him from his fiduciary duties to Dr. Bocek. This theory could be viable only if one ignores the law of agency. *See infra*, Part 5.

### 3.    There Is Overwhelming Evidence Demonstrating That Amato was Dr. Bocek's Agent Because Dr. Bocek Asked Amato to Act for Him and at His Direction and Amato Manifested Consent to Do So.

There are numerous facts — entirely undisputed — that demonstrate without reasonable challenge that Amato was Dr. Bocek's agent.  The Virginia Supreme Court has long held that a fiduciary relationship results from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act.  Murphy v. Holiday Inns, Inc., 216 Va. 490, 492 (1975).

The evidence demonstrates that Dr. Bocek consented to Amato acting on his behalf and subject to his control:

- ❖ Dr. Bocek shared a business opportunity with Amato for the purpose of gaining Amato's opinion as to the merit of the opportunity and then asked Amato to assist him in pursuing that business opportunity.

- ❖ Dr. Bocek shared information regarding ACC with Amato and gave instructions to him on how to proceed.

- ❖ Dr.  Bocek  exchanged email correspondence with Amato both seeking information and providing information, demonstrating his expectation that Amato would act on his behalf.

- ❖ Dr. Bocek directed Amato not to disclose his identity in negotiating the purchase of ACC.

- ❖ Dr. Bocek reviewed Amato's draft due diligence requests.

- ❖ Dr. Bocek agreed to pay Amato for his work on Dr. Bocek's behalf.

31

❖ Dr. Bocek outlined his understanding of the terms of his relationship with Amato and JGA.

❖ Dr. Bocek supervised the Defendant's work, such as providing comments and suggestions on the work Defendants had completed and requested a time-line for the acquisition.

❖ Dr. Bocek discussed his plans for management changes at ACC and requested copies of reports acquired by JGA and billed to Dr. Bocek.

Thus, the first prong of the *Murphy* proof of agency is plainly satisfied.

There is also plain evidence that Amato consented to act on Dr. Bocek's behalf in pursuing the purchase of ACC, satisfying the second prong of *Murphy's* standard for proving the existence of agency:

❖ Amato commenced the project entirely as a result of Dr. Bocek's instructions that he do so.

❖ Amato knew that Dr. Bocek would be relying on his experience, knowledge, and judgment.

❖ Amato knew that Dr. Bocek did not want his name used during the negotiations because he had a dispute with ACC regarding the termination of his employment and if the Estate were aware of his involvement in the acquisition, it might sour the deal. Of course, this would not have been an issue if Amato were acting on behalf of Dr. Bocek.

❖ Amato submitted a checklist draft to Bocek, soliciting his "comments, edits and additions where you believe it is necessary," indicating that he was acting on Dr. Bocek's instructions.

❖ Amato requested Dr. Bocek's review of his work preparing the due diligence on ACC, clearly demonstrating that Amato understood that he was to report to Dr. Bocek.

❖ Amato reported to Dr. Bocek frequently regarding his efforts on Dr. Bocek's behalf.  (JA00232; JA00234; JA00300).

❖ Amato admitted that due diligence for the ACC acquisition was performed for Dr. Bocek.

❖ Amato made it clear to Dr. Bocek that he expected to receive a fee for his work on tasks associated with the acquisition of ACC, and of course ultimately he billed Dr. Bocek for the work that he did.  Amato also provided Dr. Bocek with a detailed time sheet for his work on the acquisition of ACC.

Thus, under the standard described in *Murphy*, it is clear that Dr. Bocek consented to Amato acting on his behalf and subject to his control and that Amato manifested consent to so act.  As such, there exists an agency relationship.  Because each of these facts is undisputed, there is no dispute as to this outcome, and this Court should therefore find that an agency relationship existed.

**4.    This Is a Paradigmatic Case of One Person Putting Special Confidence in Another Requiring the Other to Act for the Benefit of the First Party.**

1.    Agency relationships are found not only when the standard set out in *Murphy* is satisfied, but also more broadly whenever "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." H-B Ltd. P'ship v. Wimmer, 220 Va. at 179.  The instant case is a paradigm of such a relationship.

Amato admitted at trial that he was working on Dr. Bocek's behalf when he was first hired by Dr. Bocek for assistance with the creation of a new medical practice. (JA00100-03).   Amato also admitted that Dr. Bocek brought the opportunity to purchase ACC to Amato and that Amato was unaware of the opportunity before then. JA000094.  Amato further admitted at trial that Dr. Bocek shared that information with him because Dr. Bocek wished to purchase ACC.  JA000095.  He admitted that Dr. Bocek asked him for assistance in acquiring ACC.  JA000104.  Dr. Bocek, who testified that he was unsophisticated when it came to business matters (JA000169), relied on Amato's experience and knowledge.  JA000174.  Amato was aware that Dr. Bocek was relying on his experience and knowledge.  JA000087-88.  Dr. Bocek trusted Amato to pursue this acquisition on his behalf without his direct involvement in any of the interactions between Amato and ACC.  JA000174-75; *but see* JA000171.

During the course of his work exploring the ACC acquisition, Amato called on Dr. Bocek regularly for information about ACC, about the operations of allergy care medical practices, about ACC's managers, and the like. JA000101, 103.  This would cause a reasonable person in Dr. Bocek's position to believe that Amato was seeking information for the purpose of advancing Dr. Bocek's goals (particularly since Dr. Bocek was paying Amato to do this work).  JA000152-53 (Amato); JA000179-80 (Bocek).

34

Finally, there is one more compelling set of circumstances that demonstrates that Amato was well aware that Dr. Bocek had placed special confidence in him and that in equity and good conscience he was bound to act in good faith and with due regard for Dr. Bocek's interests: It is apparent that Amato recognized that the purchase of ACC had great potential to be remarkably remunerative, and he quickly began to plot to secure those profits for himself. For example, he proposed to Brian August, with whom he later would form A2 Medical Group, "I was thinking that we could front the initial purchase and then sell it back to [Dr. Bocek] at a profit." JA000249. And he responded enthusiastically to the proposal by another investor, Ron Cooper, that they purchase ACC for $1 million and then resell it to Dr. Bocek for twice the price. JA000263-64. <u>But at the very same time that he is having these discussions with August and Cooper, Amato was engaging in regular communications with Dr. Bocek that were plainly designed to demonstrate that Amato was working on Dr. Bocek's behalf as Dr. Bocek's agent</u>. JA000265-66; JA000269-271. Amato surreptitiously engaged in self-dealing while working hard to hide his self-dealing from Dr. Bocek. Amato's secret double-dealing demonstrates that he fully understood that he was bound to work on Dr. Bocek's behalf and that he understood that what he was doing was a breach of his duty to Dr. Bocek.

**5.     Amato Offers Only the Flimsiest of Defenses to His Breach of His Fiduciary Duties.**

Amato posits that while he was Dr. Bocek's agent <u>initially</u>, somehow that agency, and the fiduciary duty born of it, ended.  He admits that he was initially Dr. Bocek's agent:

> Q.     And you also understood that what you were to be doing, you were doing it for Dr. Bocek, right?
>
> A.     Up to a certain point in time, yes.
>
> Q.     And you would be acting subject to his instructions and his directions, right?
>
> A.     Up to a certain point in time earlier in the process, yes.

JA00088.  But he then makes the specious claim that Dr. Bocek's interest in acquiring ACC diminished in the middle of December:

> Q.     Dr. Bocek's interest in buying ACC did not diminish at all during December, did it?
>
> A.     Yes, it did.
>
> Q.     It did?
>
> Q.     In a sense it did because he was concerned that he could not -- we talked about the structure of the deal and we talked about the 20 percent down, and he was sharing with us that I can't come up with the money.  I might have to go to my cousin.  I might have to liquidate my 401(k).  I just bought a house.

* * *

36

So it did morph about the 16th, specifically, right before his left for overseas. It changed, the deal changed completely where, you know, we were looking at it now as what options or opportunities are available to Dr. Bocek, you know, should he not have the money. Should, you know, we have to bring in a mezzanine investor, should we purchase the business, you know, and then what we would do after that, because he was basically putting us in the position to purchase the business, meaning JGA.

So there were a lot of options that were starting to develop. So, you know, you're asking a question like it ran through infinity and it didn't. It stopped at a certain point in time where basically Bocek relinquished, you know, his direction and his mandate and his telling us what to do to what can I do? How can I be involved? How can we make this thing work where I can be involved at some point?

JA00105-06.

To say that this monologue is unconvincing is an understatement. Amato asserts that Dr. Bocek's interest in buying ACC diminished — at least, "in a sense it did," he said — but nothing of what he said in any way demonstrated that Dr. Bocek's interest diminished. Dr. Bocek expressed concern that he lacked cash for the purchase, but Amato offers not one whit of evidence to show that Dr. Bocek's interest diminished. In fact, Amato himself explains that Dr. Bocek had options available to him for getting cash, if indeed it became necessary that he do so, by liquidating his 401(k) account or borrowing money from a wealthy cousin. In short, nothing that Amato said demonstrated that Dr. Bocek's interest waned.

37

Moreover, even if, *arguendo*, Dr. Bocek's interest had "diminished," that would not have terminated Amato's fiduciary duty to Dr. Bocek. In Virginia, the prohibition against using confidential employer information continues to apply even after the conclusion of the employment relationship. *See* International Paper Co. v. Gilliam, 63 Va.Cir. 485, 2003 WL 23573613, at *5. As the Supreme Court of Virginia has held, after the termination of the employment relationship, the agent:

> has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty.

Peace v. Conway, 246 Va. 278 (1993) (*quoting* the Restatement (Second) of Agency § 396 (1958)); *see also* Depuy Synthes Sales, Inc. v. Jones, 2014 WL 1165852 (E.D.Va.). In Nortec Comm's, Inc. v. Lee–Llacer, the court recognized that:

> Resignation or termination does not automatically free a director or employee from his or her fiduciary obligations. Liability post-termination continues only for those transactions completed after termination of the officer's association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship.

*Nortec Comm's, Inc.*, 548 F.Supp.2d 226, 231–32 (E.D.Va. 2008) (*quoting* Today Homes, Inc. v. Williams, 272 Va. 462, 474 (2006)).

Thus, even if it were true that Dr. Bocek had a diminished interest in purchasing ACC, that does not terminate Amato's fiduciary duty to Dr. Bocek.

Amato claims that his fiduciary duty to Dr. Bocek was terminated because Dr. Bocek's interest in acquiring ACC "diminished". But Amato's explanation does not demonstrate a diminished interest; his statement that Dr. Bocek did not have the funds to acquire ACC is contradicted by his statement that Dr. Bocek said he might have to borrow funds from a cousin or take funds from a 401(k) account. And even if Dr. Bocek's interest had in fact diminished, it would not, as a matter of law, terminate Amato's fiduciary duty to Dr. Bocek.

Thus, Amato presents no defense to his breach of fiduciary duties.

6. **Because the Undisputed Facts Demonstrate That Amato Was Bocek's Agent and Owed a Fiduciary Duty to Bocek, and Because Amato Has No Defense to His Breach of That Duty, Dr. Bocek Is Entitled to Judgment.**

Under Virginia law,

> [when] a plaintiff has shown that a corporate opportunity existed and the corporate fiduciary appropriated it without disclosure and the consent of the corporation, a prima facie case has been shown. Under our jurisprudence, the burden shifts to the defendant fiduciary to show why the taking of the corporate opportunity was not a breach of his fiduciary duty.

39

<u>Today Homes, Inc. v. Williams</u>, 272 Va. 462, 473 (2006). Here, Amato made no show (or even effort to show) that the taking of the opportunity was not a breach of his fiduciary duty. Thus, because the undisputed facts demonstrate that Amato was Dr. Bocek's agent and owed a fiduciary duty to Dr. Bocek, and because Amato has no defense to his breach of that duty, Dr. Bocek is entitled to judgment.

## C.      The District Court Erred in Concluding That Dr. Bocek Did Not Prove Damages.

The district court also found that Amato's breach of fiduciary duties was not "the direct and proximate cause of Dr. Bocek's failure to collect an income or prospective profits" because Dr. Bocek had been fired for cause from ACC. JA00661. But this conclusion confuses the facts.

Dr. Bocek is not seeking recovery for lost wages arising out of his termination of employment. If he were, the district court's finding would be correct. Dr. Bocek's losses calculation does not seek recompense from the date of the termination of his employment with ACC. It seeks the revenue that he would have enjoyed when and if he had purchased ACC. The cause of Dr. Bocek's loss is not the termination of his employment by ACC; it is the theft of the opportunity to purchase ACC. Thus, the district court's focus on the termination of his employment by ACC is clear error.

40

Dr. Bocek testified that when he stopped working at ACC, he was earning $450,000 per year and that he expected to earn the same amount or more when he returned to ACC as an owner.  JA00175.  He also testified that the entry level salary for board-certified allergists is about $180,000 to 200,000 per year, and that the salary for a physician with Dr. Bocek's research experience and years of practice would be expected to be in the range that Dr. Bocek was earning at ACC.  JA00176.

Amato presented no evidence contradicting Dr. Bocek's testimony.   While Amato did present testimony that ACC (in its new incarnation as A2 Medical Group) had losses of about $2,000 in 2011 (JA00067) and $150,000 in 2012 (JA00070), those numbers are inapposite.  The question is not whether ACC ultimately showed a profit or loss after paying for its expenses, including physician salaries.  The question is what revenue Dr. Bocek would have received as the owner-physician of the practice, receiving not only profits but also the income which was (under Amato's ownership) instead paid to a different doctor.  Nor do the losses that ACC suffered have any meaning in a loss analysis because those numbers are the numbers reflected on ACC's tax return and therefore would reflect "paper losses" such as depreciation, which does not speak to the income that Dr. Bocek would have received.

Amato presented no evidence of any sort contradicting Dr. Bocek's testimony that a physician of his experience would earn less than the amounts that Dr. Bocek

testified to, or even that physicians at ACC earned less. The only evidence in the record is Dr. Bocek's testimony regarding the ordinary pay received by allergists, buttressed by his actual pay history proving that his testimony was credible.

In addition, Dr. Bocek is entitled to recompense for the value of the asset which was wrongfully taken by Amato. Amato and August agreed that ACC was worth $3 million when they acquired it. *See supra* pp. 17-18. That admission is an adequate and reasonable basis for finding that the value of the asset stolen from Dr. Bocek is $3 million.

Finally, when property has been acquired by improper means, equitable relief in the form of a constructive trust is appropriate.

> "A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other.

Leonard v. Counts, 221 Va. 582, 588-90 (1980) (*quoting* Restatement of Restitution § 194(2), p. 795). A constructive trust is appropriately imposed to avoid unjust enrichment of a party. Cooper v. Cooper, 249 Va. 511, 517 (1995). *Horne*, 167 Va. at 240 (equity will regard the person who wrongfully takes an opportunity belonging to another as a constructive trustee and will compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom").

42

Here, Amato acquired information about the opportunity to purchase ACC (as well as its likely profitability) from Dr. Bocek.  He agreed to pursue the acquisition on behalf of Dr. Bocek.  In violation of his fiduciary duty, Amato instead took the business opportunity for himself; he therefore stands as a constructive trustee and must convey to Dr. Bocek "a proper interest in the property or [] account to him for the profits derived therefrom."  Id.

Thus, Dr. Bocek has presented competent and persuasive evidence of damages which remains unopposed by cognizable evidence.

**D.     For the Appearance of Justice, this Case Should Be Reassigned.**

The district judge who has been hearing this case has twice dismissed Dr. Bocek's claim for breach of fiduciary duties.  In granting judgment in favor of the Defendants, the district judge disregarded this Court's prior decision.  This Court explicitly held:

> The evidence in the record is more than sufficient, for summary-judgment purposes, to support the factual allegations outlined above, and there is little question that, under the general law of agency, the conduct Bocek alleges is a clear breach of fiduciary duty.

At trial, each of the material facts alleged in the amended complaint and in the Plaintiff's opposition to summary judgment on review in the prior appeal was proved

in a way which is not subject to meaningful dispute. As such, there should have been no question as to the outcome of the case.

Furthermore, after the trial, the district judge required prompt submission of findings of fact and conclusions of law, even though the court's schedule did not permit adequate time for the trial transcript to be prepared, which meant that the findings of fact could not reflect the actual testimony delivered. In numerous respects, the district judge's opinion did not reflect the actual testimony given at trial. This creates the impression that the district judge was not concerned with the facts as they had been developed at trial because he had prejudged the case.

These circumstances create the impression that the district judge has prejudged the case. For the sake of the appearance of justice, and to minimize the suspicion of partiality, the case should be assigned to a new district judge. U.S. v. Guglielmi, 929 F.2d 1001, 1007 (4th Cir.1991) (internal quotation marks omitted).

This Court has provided that in determining whether such circumstances exist, a court should consider (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to

44

any gain in preserving the appearance of fairness. <u>U.S. v. N. Carolina</u>, 180 F.3d 574, 582-83 (4th Cir. 1999); *see also* <u>U.S. v. Lentz</u>, 383 F.3d 191, 221-22 (4th Cir. 2004).

The circumstances described herein (and *see also* pp. 21-22, *supra*) demonstrate that there is a reasonable concern that the district judge can be expected to have substantial difficulty in putting out of his mind his previously expressed erroneous views and findings. The circumstances also demonstrate that reassignment is advisable to preserve the appearance of justice. Reassignment would not entail waste or duplication out of proportion to any gain in preserving the appearance of fairness because the facts are not complicated in this case, the tasks remaining in this case are not complex, and the continued litigation of this case will not require knowledge of the prior proceedings of the case. As such, reassignment is appropriate.

## CONCLUSION

For all the foregoing reasons, Dr. Bocek respectfully requests that this Court reverse the district court's grant of judgment in favor of the Defendants, enter judgment for Dr. Bocek, and remand the case with instructions that it be reassigned to a new district judge for determination of the appropriate remedy.

## REQUEST FOR ORAL ARGUMENT

Dr. Bocek respectfully requests oral argument on the matters presented in this appeal.

Respectfully submitted,

<u>   August 25, 2014   </u>     <u>  /s/ S. Micah Salb  </u>

S. Micah Salb, Esq.
Mary E. Kuntz, Ph.D., Esq.
LIPPMAN, SEMSKER & SALB, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, Maryland 20814
(301) 656-6905

*Attorneys for Plaintiff-Appellant*

46

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Federal Rules of Appellate Procedure and Local Rule 25(b) of the United States Court of Appeals for the Fourth Circuit, I hereby certify that on this the 25th day of August, 2014, I filed the required copies of the Brief for Appellant with the Office of the Clerk of this Court, and have mailed, first-class United States postage pre-paid, the required copies of the Brief for Appellant to:

> Mark Cummings, Esq.
> Sher, Cummings and Ellis
> 3800 Fairfax Drive Suite 7
> Arlington, Virginia 22203
>
> *Counsel for Defendants*

| | |
|---|---|
| __August 25, 2014__ | __/s/ S. Micah Salb__ |
| Date | S. Micah Salb, Esq. |

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)

I hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) that a brief contain less than 14,000 words; inasmuch as it contains 9,412 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using WordPerfect in Times New Roman 14 point type.

| | |
|---|---|
| __August 25, 2014__ | __/s/ S. Micah Salb__ |
| Date | S. Micah Salb, Esq. |